324 S.E.2d 402

**In re Pierre E. DOSTERT, Judge.**

**No. 26–84.**

Supreme Court of Appeal of West Virginia.

Nov. 7, 1984.

Statement on Disqualification Nov. 8, 1984.

Dissenting Opinion Nov. 15, 1984.

. . . .

Rice, Hannis & Douglas and Richard L. Douglas, Martinsvurg, for Dostert.

Charles R. Garten, Charleston, for Judicial Hearing Board.

McGRAW, Justice:

This extraordinary judicial disciplinary proceeding arises under Rule II(J) of the Rules of Procedure for the Handling of Complaints Against Justices, Judges and Magistrates (Supp.1984). The initiation of this disciplinary proceeding was precipitated by the criminal contempt conviction of Judge Pierre E. Dostert of the Thirty-first Judicial Circuit on April 27, 1984. We address several issues presented by this disciplinary action. First, whether Judge Dostert should be suspended pending final disposition of the judicial disciplinary proceeding against him. Second, whether two retroactive service credit provisions contained within our judicial retirement system are unconstitutional violations of two separate

constitutional prohibitions. Third, whether judicial members of the public employees retirement system are entitled to retroactive service credit on the same terms as members of the judicial retirement system. Finally, whether the constitutional standard for judicial disability applies in disciplinary disability retirement proceedings involving judges who are members of the public employees retirement system. Prior to our discussion of these issues, some procedural and factual background is in order.

I

Following Judge Dostert's criminal contempt conviction, the Administrative Director of the Supreme Court of Appeals filed a complaint against Judge Dostert with Counsel for the Judicial Investigation Commission on May 10, 1984, pursuant to Rule II(J)(1) of the Rules of Procedure for the Handling of Complaints Against Justices, Judges and Magistrates (Supp.1984).[1] After completing an investigation, the Judicial Investigation Commission determined that probable cause existed to file a complaint with this Court against Judge Dostert on June 22, 1984, pursuant to Rule II(J)(2) of the Rules of Procedure for the Handling of Complaints Against Justices, Judges and Magistrates (Supp.1984).[2] The complaint charged Judge Dostert with violations of Canons 1, 2A, 3A(1), 3A(3), and 3B(1) of the Judicial Code of Ethics.[3]

1. Rule II(J)(1) of the Rules of Procedure for the Handling of Complaints Against Justices, Judges and Magistrates (Supp.1984), provides:

Upon information and belief that a Judge has been indicted or otherwise charged with a serious offense, has engaged in some breach of, or is not performing in accordance with, the Judicial Code of Ethics, or has violated or become unable to perform, or refuses to perform, his legal obligations, the Court Administrator, or his designate, independent of the Court, may immediately initiate and file a complaint setting forth such information with Counsel for the Commission. Upon receipt of such complaint, Counsel for the Commission shall cause an immediate investigation to be made of the facts and circumstances surrounding such incident.

2. Rule II(J)(2) of the Rules of Procedure for the Handling of Complaints Against Justices, Judges and Magistrates (Supp.1984), provides, in pertinent part, that:

Notwithstanding any other provision of these rules to the contrary, Counsel for the Commission is hereby authorized, empowered, and directed to report to the Supreme Court, in writing any information obtained, by filed complaint or otherwise, which immediately and sufficiently indicates or alleges that the integrity of the legal system has been placed in question by any Judge by virtue of his having been indicted or otherwise charged with a serious offense, having engaged in some breach of the Judicial Code of Ethics, or become unable to perform his legal obligations.

3. In the complaint, counsel for the commission states that its allegations of violations of the Judicial Code of Ethics are based on the following:

(1) On February 4, 1983, in a case styled *State of West Virginia v. Pierre E. Dostert, Judge of the Circuit Court of Jefferson County,* *West Virginia, No. CR–83–M–1,* upon an application and motion for the Court to enter an Order issuing a rule to show cause, the Kanawha County Circuit Court entered an Order against Pierre E. Dostert, Judge of the Circuit Court of Jefferson County, West Virginia, ordering him to appear before the Court to "show cause if any he could why he should not be adjudged guilty of criminal contempt for unlawfully, wilfully and contemptuously on February 9, 1982, disobeying, ignoring, interfering with and causing Ray Boyd and Wallace Gifft to unlawfully surrender the person of Gary William Walker to the officer(s) of the State of Florida thereby causing the same Ray Boyd and Wallace Gifft to act in disobedience of the lawful Order given February 9, 1982, by the Supreme Court of Appeals of West Virginia, which order stayed the execution of the final Order of Pierre E. Dostert also of February 9, 1982, in the extradition proceeding styled *State of West Virginia v. Gary William Walker, No. 81–F–59,* pending appeal, which final Order of Pierre E. Dostert directed that the person of Gary William Walker be surrendered to the officer(s) of the State of Florida and why he should not be punished therefor by a determinate sentence of imprisonment or fine or both."

(2) On April 24, 1984, the trial of the case *State of West Virginia v. Pierre E. Dostert, Judge of the Circuit Court of Jefferson County, West Virginia, No. C–83–17–1,* began in the Kanawha County Circuit Court before a jury.

(3) On April 27, 1984, the jury found the defendant, Pierre E. Dostert, guilty of criminal contempt as charged in the Order to show cause issued in the case of *State of West Virginia v. Pierre E. Dostert, Judge of the Circuit Court of Jefferson County, West Virginia, No. CR–83–M–1.*

Further background in the criminal contempt proceeding against Judge Dostert is detailed in

On June 26, 1984, this Court entered an order, pursuant to Rule II(J)(2) of the Rules of Procedure for the Handling of Complaints Against Justices, Judges and Magistrates (Supp.1984),[4] scheduling a July 16, 1984, hearing on the complaint. Additionally, it having come to the Court's attention through administrative channels [5] and through the public record [6] that Judge Dostert claimed ill health, the Court ordered the Administrative Director of the Supreme Court of Appeals, the constitutional judicial officer charged under article VIII, § 3 of the West Virginia Constitution with preparation and submission of the judicial budget, and whose duties include the maintenance, administration, and certification of records relating to the judicial retirement system, to intervene as a party in interest.

On July 10, 1984, Judge Dostert filed a motion to continue the scheduled hearing due to poor health, agreeing to refrain from conducting his judicial duties until final resolution of the complaint. Specifically, Judge Dostert stated that he was suffering from "vaso-spastic Coronary Artery Disease." This motion was granted, and the hearing was rescheduled for September 5, 1984.

On August 10, 1984, Judge Dostert again moved to continue the scheduled hearing due to continuing health problems. In addition, on August 28, 1984, the Administrative Director petitioned for clarification of the retirement statutes implicated in Judge Dostert's disciplinary proceeding. On August 31, 1984, Judge Dostert's motion to continue was granted and, because of their statutory duties, copies of the intervenor's petition were ordered to be transmitted to the Governor,[7] the Auditor,[8] the Treasurer,[9] and the Attorney

*State ex rel. Walker v. Giardina,* 170 W.Va. 483, 294 S.E.2d 900 (1982).

**4.** Rule II(J)(2) of the Rules of Procedure for the Handling of Complaints Against Justices, Judges and Magistrates (Supp.1984), provides, in pertinent part, that:

Upon such notification, the Supreme Court, upon determining that cause exists, shall provide notice of the charges to the Judge with the right to hearing in not less than twenty (20) days before the Supreme Court. After such hearing, the Supreme Court may suspend the Judge with or without pay until the underlying disciplinary proceeding before the Judicial Investigation Commission has been completed; provided, however, that the Chief Justice of the Supreme Court may order that a Judge not hear any further civil or criminal matters while under indictment for a felony or misdemeanor without application to the Judicial Investigation Commission, in which event the Judge may petition the Supreme Court for a hearing.

**5.** On June 14, 1984, the Administrative Director of the Supreme Court of Appeals received a letter from Judge Dostert, accompanied by a statement from his treating physician, which indicated that he desired a medical leave of absence due to health problems.

**6.** *See, e.g., Dostert Found Guilty, Admitted to Hospital,* Charleston Gazette, April 29, 1984, at pg. 1, col. 4.

**7.** West Virginia Constitution art. VII, § 5 provides that the Governor "shall take care that the laws be faithfully executed." The Governor is also charged with the appointment of certain members of the public employees retirement board. *See* West Virginia Code §§ 5–10–5—7 (1979 Replacement Vol.). In addition, the Governor is charged with transmittal to the Legislature of an annual report on fiscal affairs and transactions of the public employees retirement system prepared by the board of trustees of the public employees *retirement system. See* West Virginia Code § 5–10–11 (1979 Replacement Vol.). Under the judicial retirement system, the Governor is charged with fixing the amount of a bond to be given by the Treasurer for the performance of his duties as custodian of the judicial retirement fund. *See* West Virginia Code § 51–9–3 (1981 Replacement Vol.). Further, the Governor is charged with making disability determinations upon written application by judges of courts of record under the judicial retirement system statute. *See* West Virginia Code § 51–9–8 (1981 Replacement Vol.).

**8.** The Auditor is a statutory member of the public employees retirement system board of trustees. *See* West Virginia Code § 5–10–5(a) (1979 Replacement Vol.). Under the judicial retirement system statute, the Auditor is "the *fiscal officer responsible for the records and* administration of the fund, including budgetary matters incident to the authority vested in him with respect to judicial department appropriations under article VI, section 51 of the Constitution of West Virginia." *See* West Virginia Code § 51–9–3 (1981 Replacement Vol.).

**9.** The Treasurer is a statutory member of the public employees retirement system board of

General,[10] with a request that they file memoranda setting forth their positions with respect to the issues raised therein.[11] Because of Judge Dostert's voluntary agreement to refrain from exercising the powers of his judicial office, the issues in this proceeding were bifurcated into the suspension matter and the disability retirement matter. A final hearing was held regarding the disability retirement matter on September 12, 1984.

## II

■ Under Rule II(J)(2) of the Rules of Procedure for the Handling of Complaints Against Justices, Judges and Magistrates (Supp.1984), we must first address the issue of Judge Dostert's suspension pending final disposition of the underlying disciplinary proceeding against him. We note, that Judge Dostert has voluntarily agreed to refrain from judicial exercise until final resolution of the complaint against him and that he has filed a disability claim with the Workers' Compensation Commission due to his continuing medical problems. In accord with Judge Dostert's voluntary agreement to refrain from exercising the judicial power of the State, the Chief Justice entered an order on July 11, 1984, relieving Judge Dostert of all judicial duties until further notice. This order remains in effect. Accordingly, we will not conduct, as unnecessary, a suspension hearing pursuant to Rule II(J)(2) of the Rules of Procedure for the Handling of Complaints Against Justices, Judges and Magistrates (Supp.1984) pending final disposition of the disciplinary complaint against Judge Dostert.

## III

■ In a judicial disciplinary proceeding in which a claim of ill health or disability appears on the face of the record, article VIII, § 8 of the West Virginia Constitution must be considered, which provides, in pertinent part, that:

> [T]he supreme court of appeals is authorized to ... retire any ... judge ... who is eligible for retirement under the West Virginia judges' retirement system (or any successor or substituted retirement system for ... judges ...) and who, because of advancing years and attendant physical or mental incapacity, should not, in the opinion of the supreme court of appeals, continue to serve as a ... judge ....

As previously noted, Judge Dostert's deteriorating physical condition has resulted in a claim for workers' compensation disability benefits and recusal from the exercise of his judicial duties. Therefore, issues involving the interpretation of our judicial retirement statutes and West Virginia Constitution art. VIII, § 8 are raised.

## IV

There are two different retirement systems in which members of the judiciary may participate: the West Virginia Retirement System for Judges of Courts of Record, West Virginia Code §§ 51–9–1—16 (1981 Replacement Vol.) and under the West Virginia Public Employees Retirement Act, West Virginia Code §§ 5–10–1—52 (1979 Replacement Vol. & Supp.1984).

■ Under West Virginia Code § 5–10–2(6) (1979 Replacement Vol.), the term "Employee," as used in the West Virginia Public Employees Retirement Act, "means any person who serves regularly as an officer ... and whose compensation is payable in whole or in part by any political subdivision [12] ...." This definition in-

trustees. *See* West Virginia Code § 5–10–5(b) (1979 Replacement Vol.). Under the judicial retirement system, the Treasurer is "the custodian of the fund and of any investment securities of the retirement system." *See* West Virginia Code § 51–9–3 (1981 Replacement Vol.).

10. West Virginia Code § 5–10–9(d) (1979 Replacement Vol.) provides that, "The attorney general shall be the legal advisor to the board of trustees" of the public employees retirement system.

11. In response, the Attorney General filed a memorandum on his own behalf and on behalf of the State Treasurer and the State Auditor, while the Governor submitted a letter through counsel, stating that he is not qualified to speak as to the constitutionality of the challenged provisions of the judicial retirement system.

12. We note the broad definition of the term "political subdivision" contained in the public employees retirement system statute. *See* footnote 33, *infra.*

cludes Article VIII judicial officers. Judge Dostert is currently a member of the public employees retirement system under this provision.

■ Participation in the public employees retirement system is mandatory for all individuals included within the definition of "Employee." [13] *See* West Virginia Code § 5–10–17(a) (Supp.1984). Under West Virginia Code § 5–10–17(b) (Supp.1984), however, "The membership of the [public employees] retirement system shall not include any person who ... [has elected to be] a member of ... the judges' retirement system ...." Under West Virginia Code § 51–9–5 (1981 Replacement Vol.), "[A]ny judge ... shall ... become eligible for retirement benefits by paying into the judges' retirement fund all contributions he would have been required to pay ... together with interest thereon at four percent ...," even though such judge may have initially elected to participate in the public employees retirement system. After this election, the judge is exempt from participation in the public employees retirement system under West Virginia Code § 5–10–17(b) (Supp.1984). Therefore, although Judge Dostert is currently a member of the public employees retirement system, we must examine the issue of his eligibility for disability benefits under both systems due to the option to participate contained within the judicial retirement system statute.

## V

In full discharge of his constitutional duties as the Article VIII judicial officer charged with the maintenance, administration, and certification of judicial salary and retirement records, the Administrative Director of the Courts, as intervenor, seeks resolution of several issues [14] concerning the judicial retirement system and the public employees retirement system which impact upon Judge Dostert's potential disability retirement; upon disability retirement in similar circumstances; and upon administration of the judicial retirement system and the public employees retirement system in general. We are here addressing only those issues which can be framed as a matter of law and which we believe are essential to Judge Dostert's establishing his eligibility for benefits under the judicial or public employee retirement systems. First, the record frames an issue of the constitutionality of West Virginia Code

---

**13.** Certain exceptions are made, however, to the mandatory language contained in West Virginia Code § 5–10–17(a) (Supp.1984). For example, West Virginia Code § 5–10–17(b) (Supp.1984) provides that:

> The membership of the retirement system shall not include any person who is a member of, or has been retired by, the state teachers' retirement system, the judges' retirement system, *the retirement system of the department* of public safety, or any municipal retirement system for either, or both, policemen or firemen; and the West Virginia department of employment security, by the commissioner of such department, may elect whether its employees will accept coverage under this article or be covered under the authorization of a separate enactment....

*See also* West Virginia Code §§ 5–10–2(6) and 5–10–17(c) (1979 Replacement Vol. & Supp. 1984).

**14.** The Administrative Director raises several other issues with regard to the judicial retirement system which will not be addressed. First, the Administrative Director notes that although West Virginia Code § 51–9–6b (1981 Replacement Vol.) provides for survivors' benefits

for the *widows* of participating judges, there is no corresponding mention of survivors' benefits for the *widowers* of participating judges. Second, the Administrative Director mentions that although judges who are over sixty-five years of age need only serve eight years in order to qualify for retirement benefits and need only serve six years in order to qualify for disability benefits under West Virginia Code § 51–9–6a (1981 Replacement Vol.), judges who are under sixty-five years of age must serve sixteen years in order to qualify for retirement benefits under West Virginia Code § 51–9–6 (1981 Replacement Vol.) and must serve ten years in order to qualify for disability benefits under West Virginia Code § 51–9–8 (1981 Replacement Vol.). Finally, the Administrative Director, in the course of his petition, compares and contrasts distinctions between the public employees retirement system and the judicial retirement system which he contends violate the equal protection rights of participating judges. Because these issues are not directly related to the resolution of the immediate case, we defer these determinations to another time. The other issues relating to Judge Dostert's entitlement under equal protection concepts should be further developed if he chooses upon remand.

§ 51–9–6 (1981 Replacement Vol.), which grants military service credit to judges who serve in the military during their term of office. Second, the record frames an issue of the constitutionality of West Virginia Code § 51–9–6 (1981 Replacement Vol.), which grants retroactive governmental service credit to judges who have served as prosecuting attorneys. Third, the record raises a question about the equal applicability of retroactive service credit under the judicial retirement system to judicial members of the public employees retirement system. Finally, the record challenges the constitutionality of West Virginia Code § 51–10–25 (1979 Replacement Vol.), which deals with disability determinations under the public employees retirement system, as it applies to participating members of the judiciary in the context of disability retirement proceedings.

## VI

The first two issues framed concern legislative grants of service credit under West Virginia Code § 51–9–6 (1981 Replacement Vol.).[15] The section grants military service credit to judges who serve in the military during their terms of office and grants governmental service credit to judges who were former prosecuting attorneys. Both of these special grants of service credit clearly violate explicit constitutional prohibitions.

 West Virginia Constitution art. VIII, § 7 provides, "No ... judge ... shall hold any other office, or accept any ap-

pointment or public trust, under this or any other government ... and the violation of any of these provisions shall vacate his judicial office." This prohibition against dual officeholding preserves a separation of powers and promotes an independent judiciary by insulating judicial officers from the orders of other nonjudicial officers or employers. Due to its clear applicability to military service,[16] the military being a part of the executive branch of government, it mandates that a judge who enters the military "shall vacate his judicial office." Rather than providing that a judge who enters active military service must surrender his or her judicial office, however, West Virginia Code § 51–9–6 (1981 Replacement Vol.) contemplates that judges retain their positions, accruing retirement benefits as an element of judicial compensation which accompany those positions, despite entering active military service. We therefore hold that the language in West Virginia Code § 51–9–6 (1981 Replacement Vol.), "any portion of the term of office of any judge of a court of record," which is so specially drawn[17] as to mandate dual officeholding, is unconstitutional under West Virginia Constitution art. VIII, § 7.

 West Virginia Constitution art. VI, § 39 provides "in no case shall a special act be passed, where a general law would be proper." As this Court stated in Syllabus Point 1 of *State ex rel. Taxpayers Protective Association of Raleigh County v. Hanks*, 157 W.Va. 350, 201 S.E.2d 304 (1973), "A basic purpose of Article VI, Sec-

---

**15.** West Virginia Code § 51–9–6 (1981 Replacement Vol.) provides, in pertinent part, that:

In determining eligibility for the benefits provided by this section, any portion of the term of office of any judge of a court of record which shall have elapsed while such judge was on active duty (including leaves, furloughs, and time consumed going to his place of duty and returning to his place of residence after discharge or release from active duty) in the armed forces of the United States shall be considered as served: Provided further, that any judge who enters active duty in the armed forces of the United States during his term of office and after the effective date [June 5, 1949] of this article shall during, or within one year after such military service, pay into the state treasury all contributions

required by section four [§ 51–9–4] of this article, and, by reason of such military service not deducted from his salary: Provided further, that if a judge of a court of record has served for a period of not less than ten full years and has made payments into the judges retirement fund as provided in this article for each month during which he served as judge, following the effective date of this section, any portion of time which he had served as prosecuting attorney in any county in this State shall qualify as years of service.

**16.** *See Frazier v. Elmore,* 180 Tenn. 232, 239–41, 173 S.W.2d 563, 565–66 (1943).

**17.** *See* discussion page fourteen, *infra.*

tion 39 of the Constitution of West Virginia is to preserve uniformity and consistency in the statutory enactments of this State." *See also* Syl. pt. 3, *Atchinson v. Erwin,* 172 W.Va. 8, 302 S.E.2d 78 (1983). Through the prosecuting attorney credit provision of West Virginia Code § 51–9–6 (1981 Replacement Vol.), created by special act in 1972, *see* 1972 W.Va. Acts ch. 29, the Legislature appears to have singled out one special class of public employee for retroactive governmental service credit benefit. We fail to see any relationship between the exercise of prosecutorial power and the exercise of judicial power which supports this exclusive grant of credit.[18] In Syllabus Point 2 of *State ex rel. Taxpayers Protective Association of Raleigh County v. Hanks, supra,* this Court stated that, "A statute is general when it operates uniformly on all persons and things of a class and such classification is natural, reasonable and appropriate to the purpose sought to be accomplished." *See also* Syl. pt. 5, *Atchinson v. Erwin, supra;* Syl. pt. 9, *State ex rel. Heck's, Inc. v. Gates,* 149 W.Va. 421, 141 S.E.2d 369 (1965); Syl. pt. 3, *State ex rel. Plymale v. City of Huntington,* 147 W.Va. 728, 131 S.E.2d 160 (1963). Conversely, a legislative classification drawn with such specialty that it predicates retroactive governmental service credit in the judicial retirement system upon service "as prosecuting attorney in any county" falls squarely within the constitutional prohibition against special legislation. We therefore hold that the language in West Virginia Code § 51–9–6 (1981 Replacement Vol.), "as prosecuting attorney in any county," violates the constitutional prohibition against special legislation found in West Virginia Constitution art. VI, § 39.

## VII

▮ West Virginia Code § 51–9–16 (1981 Replacement Vol.)[19] is a severability section contained in the judicial retirement system statute which provides that:

> If any section, subsection, clause, phrase, or requirement of this article is for any reason held to be unconstitutional, such decision shall not affect the validity of the remaining portions. The legislature hereby declares that it would have passed this article, and each section, subsection, sentence, clause or phrase and requirement thereof, irrespective of the fact that any one or more sections, subsections, clauses, phrases or requirements be declared unconstitutional.

This provision parallels West Virginia Code § 2–2–10(cc) (1979 Replacement Vol.), governing general statutory construction, which provides that:

> [T]he provisions of every section, article or chapter of this Code ... shall be severable so that if any provision of any such section, article or chapter is held to be unconstitutional or void, the remaining provisions of such section, article or chapter shall remain valid, unless the court finds the valid provisions are so essentially and inseparably connected with, and so dependent upon, the unconstitutional or void provision that the court cannot presume the legislature would have enacted the remaining valid provisions without the unconstitutional or void one, or unless the court finds the

---

**18.** In fact, while former prosecuting attorneys are granted credit, former public defenders, Attorneys General, or even magistrates, are excluded. We further note that not all prosecuting attorneys are full-time public servants. Only prosecuting attorneys in class I and II counties must devote full time to their public duties to the exclusion of outside employment. *See* West Virginia Code § 7–7–4 (Supp.1984). According to figures prepared by the State Tax Commissioner for the 1983 tax year, only eleven out of our fifty-five counties qualify as class I or II counties. *See* State Tax Commissioner, *Study of Property Valuations As they Relate to Levies Laid for the Support of Schools in West Virginia* (1984); *see also* West Virginia Code § 7–7–3

(1984 Replacement Vol.). Therefore, eighty percent of this State's prosecuting attorneys are part-time officers.

**19.** Although this section of the judicial retirement statute was rewritten in 1979, *see* 1979 W.Va.Acts ch. 26, its provisions have remained virtually unchanged since the original enactment of the judicial retirement statute in 1949. Originally, this section provided that, "The provisions of this article are declared to be severable and if any provision or provisions hereof shall be held to be unconstitutional, such holdings shall not affect the validity of the remaining provisions." 1949 W.Va.Acts ch. 34.

remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent .... (Emphasis added). These statutory provisions are codifications of basic constitutional statutory construction severability law. *See* 16 Am.Jur.2d *Constitutional Law* §§ 265–66 (1979); *see also* Syl. pt. 6, *State v. Heston*, 137 W.Va. 375, 71 S.E.2d 481 (1952). They are also reflective of a theory of judicial restraint in the area of constitutional decisionmaking which has formed the basis of our doctrine of least intrusive remedy, as articulated by various decisions of this Court. *See Bailey v. Truby*, 174 W.Va. 8 at 12, 321 S.E.2d 302 at 306, slip op. at 2 (1984); *Anderson's Paving, Inc. v. Hayes*, 170 W.Va. 640, 295 S.E.2d 805, 807 (1982); *Don S. Co. v. Roach*, 168 W.Va. 605, 285 S.E.2d 491, 496 (1981); *State ex rel. S.M.B. v. D.A.P.*, 168 W.Va. 455, 284 S.E.2d 912, 916 (1981); *Mauck v. City of Martinsburg*, 167 W.Va. 332, 280 S.E.2d 216, 220 (1981); *Weaver v. Shaffer*, 170 W.Va. 107, 290 S.E.2d 244, 249–51 (1980); *Waite v. Civil Service Commission*, 161 W.Va. 154, 241 S.E.2d 164, 170–71 (1977); *State ex rel. Whitman v. Fox*, 160 W.Va. 633, 642–43, 236 S.E.2d 565, 571 (1977); *State ex rel. Harris v. Calendine*, 160 W.Va. 172, 176–80, 233 S.E.2d 318, 322–24 (1977); *State ex rel. Alsop v. McCartney*, 159 W.Va. 829, 839–

40, 228 S.E.2d 278, 283–84 (1976). Therefore, rather than invalidating West Virginia Code § 51–9–6 (1981 Replacement Vol.) in its entirety, we will limit the scope of our holding to that portion of the statute which is constitutionally defective. We are guided by the Legislature's instruction that we should "presume the legislature would have enacted the remaining valid provisions without the unconstitutional or void one[s]" in enacting these two service credit provisions.[20]

As we approach the general issue of judicial retirement in order to ascertain the presumed intent of these service credit provisions, a review of our organic law is in order. Article V, § 1 of the West Virginia Constitution provides that, "The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others ...." This division of powers, legislative, executive, and judicial, into separate and distinct departments of government, with no department exercising the power of another, and with no person exercising the powers of more than one department, is a fundamental constitutional mandate that each department, in the exercise of its lawful powers, shall be independent of the other.[21] In

---

**20.** Several rules of construction related to ascertaining the presumed intent are noteworthy in their applicability to the circumstances involved in this case. First, as this Court stated in Syllabus Point 10 of *Slack v. Jacob*, 8 W.Va. 612 (1875), "Courts will not presume fraudulent intent and corrupt purposes on the part of the Legislature, but will assume the contrary." *See also Wilson v. Hix*, 136 W.Va. 59, 71, 65 S.E.2d 717, 725 (1951). Second, as was stated in Syllabus Point 4 of *State ex rel. Hardesty v. Aracoma-Chief Logan No. 4523, Veterans of Foreign Wars of the United States, Inc.*, 147 W.Va. 645, 129 S.E.2d 921 (1913), "It is always presumed that the legislature will not enact a meaningless or useless statute." *See also City of Huntington, v. State Water Commission*, 135 W.Va. 568, 577, 64 S.E.2d 225, 230 (1951). Third, in *Harbert v. County Court*, 129 W.Va. 54, 70, 39 S.E.2d 177, 188 (1946), this Court stated, "It will be presumed that the Legislature intended to enact a valid, effective, and permanent statute." *See also Meisel v. Tri-State Airport Authority*, 135 W.Va. 528, 546, 64 S.E.2d 32, 42 (1951). Fourth, as we recently stated in *Thomas v. Rutledge*, 167 W.Va. 487, 280 S.E.2d 123, 130 (1981), "Our policy is to uphold legislative intent rather than

to defeat it, and if there is any reasonable way to construe legislation as constitutional, we will so construe it. *State ex rel. City of Charleston v. Coghill*, 156 W.Va. 877, 207 S.E.2d 113 (1973); *Farley v. Graney*, 146 W.Va. 22, 119 S.E.2d 833 (1961)." Therefore, finally, "When a part of an act is invalid, but the remainder reflects the legislative intent and is complete in itself, then the remainder will be upheld." Syl. pt. 5, *Prichard v. DeVan*, 114 W.Va. 509, 172 S.E. 711 (1934); *see also* Syl. pt. 7, *Meisel v. Tri-State Airport Authority, supra*; Syl. pt. 6, *State v. Sixo*, 77 W.Va. 243, 87 S.E. 267 (1915); Syl. pt. 24, *State v. King*, 64 W.Va. 546, 63 S.E. 468 (1908); Syl. pt. 6, *State ex rel. Dillon v. County Court*, 60 W.Va. 339, 55 S.E. 382 (1906), *aff'd*, 208 U.S. 192, 28 S.Ct. 275, 52 L.Ed. 450 (1908); Syl. pt. 3, *Eckhart v. State*, 5 W.Va. 515 (1872).

**21.** In *State ex rel. Barker v. Manchin*, 167 W.Va. 155, 279 S.E.2d 622 (1981), this Court recognized that, "This constitutional provision which prohibits any one department of our state government from exercising the powers of the others is not merely a suggestion, it is part of the fundamental law of our State and, as such,

furtherance of this same fundamental goal of judicial independence, our constitution mandates a combination of maturity and professional qualification for judges, through article IV, § 4 and article VIII,

it must be strictly construed and closely followed." *See also State ex rel. Quelch v. Daugherty,* 172 W.Va. 422, 306 S.E.2d 233, 235 (1983); *State ex rel. Steele v. Kopp,* 172 W.Va. 329, 305 S.E.2d 285, 293–94 (1983); *State ex rel. State Building Commission v. Bailey,* 151 W.Va. 79, 83, 150 S.E.2d 449, 452 (1966); *State ex rel. Richardson v. County Court,* 138 W.Va. 885, 890–91, 78 S.E.2d 569, 573–74 (1953); *State v. Huber,* 129 W.Va. 198, 209–11, 40 S.E.2d 11, 18–19 (1946); *Sims v. Fisher,* 125 W.Va. 512, 524–25, 25 S.E.2d 216, 222 (1943).

**22.** The issues of adequate judicial compensation and insuring judicial independence have permeated constitutional debate in this State since the framing of our first constitution. During the debates of the first West Virginia constitutional convention, the issue of adequate judicial compensation in order to attract and retain professional talent to an independent judiciary was hotly contested. *See* 2 *Debates and Proceedings of the First Constitutional Convention of West Virginia* 871–951 (1861–63).

Many delegates expressed concern that in the absence of adequate compensation for members of the judiciary, only inferior professional talent would be attracted to serve. Delegate Daniel Lamb of Ohio County stated, "[W]e may run the risk of reducing salaries so low that you cannot fill the office with any except a set of pettifogging lawyers that would be a disgrace to the position and in whose decisions and rectitude the community would have no confidence." 2 *Debates and Proceedings of the First Constitutional Convention of West Virginia* at 874. Similarly, Delegate E.B. Hall of Marion County argued:

If you make your public offices cheap, you will get cheap men to fill them.... Can we expect to find men qualified for the judicial work, requiring much legal learning, experience, business capacity, tact, and by no means undoubted integrity—for the pitiful compensation this Convention seems disposed to offer them .... Can we, in framing this fundamental law for a state afford to be governed by this petty rage for cheapness at the expense of all other considerations.

2 *Debates and Proceedings of the First Constitutional Convention of West Virginia* at 914.

Other delegates emphasized that adequate judicial compensation was an investment in the quality of our judicial branch, and that an insufficient investment could indeed cost more in the long run. For example, Delegate Peter G. Van Winkle of Wood County stated:

So I say now, the expense of this court of appeals does not consist in the salaries of the judges and clerk. What an institution of that kind is to cost a people will depend far more on the purity and business tact with which the

§ 7, not required of any other elected officer. There is a fundamental constitutional interest in attracting and retaining professional talent in order to maintain the integrity of an independent judiciary.[22]

business of the court is transacted than on the amount of a salary you pay the judges. If you get into that court men of competent abilities, men of industrious and business habits in their profession; men who will thus go on and do business and decide cases, the saving to the community at large can hardly be calculated. If, on the other hand, you get ... gentlemen ... who go there for the office, or the honor of it, or the pay of it—who take a small sum—much less than they could earn in their profession—the business of the court will be delayed, the decisions not relied upon ... why, sir, the court of appeals may cost you a great deal more than you can calculate.

2 *Debates and Proceedings of the First Constitutional Convention of West Virginia* at 879–80. Similarly, Delegate James H. Brown of Kanawha County stated:

[W]hich grade [do] you desire to have the services of[?] Lawyers who are earning no more than the salary you offer, or who are earning less, will be ready to accept; but are these the men you want? Is it better to save a few dollars in the salary and take the risk of an incompetent bench, or to invest a few dollars more and get the best the market affords?

2 *Debates and Proceedings of the First Constitutional Convention of West Virginia* at 890. *See also Id.* at 916 (Remarks by Delegate E.B. Hall of Marion County).

Delegate Brown also expressed a view, shared by many of his colleagues, that the qualitative aspect of the judicial compensation debate was fundamentally related to the very foundations of our government:

For they are not to make the law, but declare the law; and their declaration is the final declaration of it; that when it is done, it should be so done as to certainly do justice to the parties in the trial but give satisfaction to the people; because whenever the people are dissatisfied with their supreme tribunals, then they lose at once their regard and esteem for the laws of the land and for the tribunals that deliver them; and to strike at that is to strike at the foundation, because in a republic whenever the people lose their regard for the laws and tribunals of the country, then the government cannot very long exist; they are then tending rapidly towards either anarchy or monarchy.

2 *Debates and Proceedings of the First Constitutional Convention of West Virginia* at 872. Similarly, Delegate Hall of Marion County stated, "Every man has an interest more or less directly in our courts, because the good order of society, your rights, your every interest are dependent

As a means of fulfilling this fundamental constitutional interest, the West Virginia Constitution, in art. VIII, § 8 constitutionalizes judicial retirement and classifies participants who obtain certain irrevocable rights in the judicial retirement system. *See Wagoner v. Gainer*, 167 W.Va. 139, 279 S.E.2d 636 (1981). There are several important public interests that support this constitutional recognition of judicial retirement. As an integral part of judicial compensation packages, judicial retirement systems perform an important role in the attraction and retention of professional talent that might otherwise remain in the lucrative practice of law.[23] By providing a stable source of income, judicial retirement systems facilitate the recall of retired judges to serve temporary assignments.[24] Judicial retirement systems also promote

on the administration of justice ... your very lives and reputations are dependent on the purity and efficiency of that tribunal." 2 *Debates and Proceedings of the First Constitutional Convention of West Virginia* at 916; *see also Id.* at 939: "We all agree it is important for the interests of the country we should have an independent and intelligent judiciary." (Remarks of Delegate Abraham D. Soper of Tyler County).

Finally, although not couched in retirement language, there was some discussion of the need to provide a level of judicial compensation sufficient to permit judges to make provision for their old age. For example, Delegate Van Winkle stated:

> The question is here, not how much a man can live on—that ought not be the question. Everybody in this world that I am acquainted with looks to laying up a little, to make some provision either for his old days or for his family.... A man going into business, if he does not, with due industry and economy have something saved at the end of a year, has very little inducement to continue in business. If he is a man who is willing to live just from hand to mouth rather than exert himself, he is not a man calculated to conduct an important business or to sit on the judicial bench. You want a man of more energy and industry of disposition than that amounts to.

2 *Debates and Proceedings of the First Constitutional Convention of West Virginia* at 881. Similarly, Delegate Joseph S. Pomeroy of Hancock County argued, "Every man who lives honestly and uprightly in this land, I don't care what his profession is, ought to make more than a living—ought to lay by something for a wet day, for the time he is unable to work." 2 *Debates and Proceedings of the First Constitutional Convention of West Virginia* at 926.

**23.** As the Maryland Supreme Court stated in *Clark v. Tawes,* 187 Md. 195, 200, 49 A.2d 463, 465 (1946):

> [Pensions] are a part of inducement which leads competent persons to give up the greater emoluments of private employment for lesser compensation by the State. This is usually stated to be peculiarly applicable to judges who are generally able to make more in private practice than they can on the bench, and who thereby give up all chance of further increase in their estates for a fixed salary which ends when they reach a certain age.

*See also Sylvestre v. State*, 298 Minn. 142, 149, 154, 214 N.W.2d 658, 663, 666 (1973); *Walker v. Montgomery County Council,* 244 Md. 98, 101–102, 223 A.2d 181, 183 (1966).

Traditionally, legislatures have not found it politically expedient to establish levels of current compensation concomitant with the level of professionalism desired of members of the judiciary. Rather, they have created separate judicial retirement systems which provide a greater level of benefits than other more general public employment systems in which members of the judiciary might otherwise participate in lieu of adequate or appropriate current compensation. For this reason, judicial retirement system benefits are particularly critical in the attraction and retention of professional talent to the judiciary.

**24.** West Virginia Constitution article VIII, § 8, provides:

> A retired justice or judge may, with his permission and with the approval of the supreme court of appeals, be recalled by the chief justice of the supreme court of appeals for temporary assignment as a justice of the supreme court of appeals, or judge of an intermediate appellate court, a circuit court, or a magistrate court.

In the absence of a provision permitting compensation for such service, the receipt of retirement benefits would be the only inducement or incentive for a retired judge to accept such an assignment. In this regard, West Virginia Code § 51–9–10 (1981 Replacement Vol.) provides that, "Any retired judge receiving retirement benefits under the provisions hereof *shall* serve as special judge of any circuit court ... without charge or compensation ... but shall be allowed and paid his traveling expenses and other actual expenses for lodging and meals ...." (Emphasis added).

A number of other jurisdictions recognize the interrelationship between the availability for recall and the provision of adequate retirement benefits in the inclusion of recall provisions within their judicial retirement system statutes. *See, e.g.,* Ala.Code §§ 12–18–7(b), –(10)(e)—(h), –61, and –88 (1977); Ark.Stat.Ann. § 22–910 (Supp.1983); Ariz.Rev.Stat.Ann. § 38–803 (1974); Del.Code Ann. tit. 29, § 5610 (1983); Idaho Code § 1–2005 (Supp.1984); Kan.Stat. Ann. § 20–2616 (1981); Me.Rev.Stat.Ann. tit. 4, §§ 6, 6–A and 6–B (1979 & Supp.1983); Mass.

judicial independence by insuring future financial security.[25] Therefore, by fostering the attraction and retention of professional talent in order to maintain the integrity of an independent judiciary, the creation of the judicial retirement system by the Legislature vindicates both West Virginia Constitution art. VIII, § 8, which anticipates the creation of such a system, and West Virginia Constitution art. V, § 1, which mandates the maintenance of an independent judiciary. The interrelationship between the constitutionalization of judicial retirement and the fundamental separation of powers doctrine is manifest. *See Sylvestre v. State*, 298 Minn. 142, 149, 214 N.W.2d 658, 663 (1973).

In light of these fundamental constitutional considerations, we must examine the respective service credit provisions to determine legislative intent and the effect of the severability section of the statute.

■ With respect to the military service credit provision, we note that general

grants of retirement credit for military service are found in three of this State's other retirement systems. *See* West Virginia Code § 5–10–15 (1979 Replacement Vol.) (public employees); West Virginia Code § 15–2–28(b) (1979 Replacement Vol.) (department of public safety); West Virginia Code § 18–7A–17 (Supp.1984) (teachers).[26] Obviously, a grant of military service credit serves as an inducement to those who have such service to enter into public service. This rationale applies equally to the judiciary. Persons who served in the military during periods of compulsory service were necessarily required to postpone professional aspirations in deference to their legally mandated patriotic duties. Furthermore, those entering the legal profession after military service interrupted their educational pursuits were particularly disadvantaged given the provision in West Virginia Constitution art. VIII, § 7 that, "No person may ... be elected ... justice ... unless he has been admitted to practice law

Gen.Laws Ann. ch. 32, §§ 65E and G (West Supp.1984); Mont.Code Ann. § 19–5–103 (1983); N.C.Gen.Stat. §§ 7A–39.3, –52, –53, –54, and –57 (1981 & Supp.1983); N.D.Cent.Code § 27–17–03 (Supp.1983); R.I.Gen.Laws §§ 8–3–8–9 (Supp. 1983); S.C.Code Ann. § 9–8–120 (Supp.1983); Wyo.Stat. § 5–1–106(f) (Supp.1984). In fact, a few states, such as West Virginia, make the receipt of retirement benefits contingent, in certain circumstances, upon the availability of retired judges for recall. *See, e.g.,* Conn.Gen.Stat. Ann. § 51–50j (West Supp.1984); Tenn.Code Ann. § 8–36–806 (Supp.1983); Va.Code § 51–178 (Supp.1984); W.Va.Code § 51–9–10 (1981 Replacement Vol.).

**25.** It is difficult to overemphasize the historical importance of achieving an independent judiciary. Lacking the power of either the purse or the sword, the judiciary is inherently both structurally and functionally dependent on the other two branches of government. For a brief discussion of the colonial experience with the manipulation of the judiciary, *see United States v. Will,* 449 U.S. 200, 217–221, 101 S.Ct. 471, 482–83, 66 L.Ed.2d 392, 407–09 (1980). As the result of this experience, the framers of the United States Constitution were sensitive to the needs of a truly independent judiciary. At the federal level, judicial independence is primarily insured through article III, § 1 of the United States Constitution, which provides, in pertinent part, that "The Judges, both of the supreme and inferior courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall

not be diminished during their Continuance in Office." Our own state constitution reflects this concern with the need for judicial independence. Although our state constitution does not provide for life tenure, as does the federal constitution, it does provide for extended terms of office. *See* West Virginia Constitution art. VIII, §§ 2 and 5. Furthermore, West Virginia Constitution art. VIII, § 7 provides that, "Justices, judges and magistrates shall receive the salaries fixed by law ... which may be increased but shall not be diminished during their term of office, and they shall receive expenses as provided by law." This prohibition against any diminution in judicial compensation extends to retirement benefits. *See* Syl. pts. 1 and 3, *Wagoner v. Gainer,* 167 W.Va. 139, 279 S.E.2d 636 (1981).

**26.** Furthermore, it is important to note that many of the judicial retirement systems in other states contain general grants of prior military service credit. *See, e.g.,* Ala.Code § 12–18–5(b) (Supp.1984); Fla.Stat.Ann. § 121.111 (West 1982); Mich.Comp.Laws Ann. § 38.813b (West Supp.1984); Miss.Code Ann. § 25–11–117 (Supp. 1983); N.Y.Retire. & Soc.Sec.Law §§ 24(d), 24(e), 29, 29–a, 30, and 31 (McKinney 1971 & Supp.1983); Ohio Rev.Code Ann. § 145.30.1 (Page 1984); 71 Pa.Cons.Stat.Ann. § 5304 (Purdon Supp.1984); S.C.Code Ann. § 9–8–50(3) (Supp.1983); Tex.Rev.Civ.Stat.Ann. art. 43.103 (Vernon Supp.1983); Utah Code Ann. § 49–7a–41 (Supp.1983); Wis.Stat.Ann. § 40.02(15)(c) (West Supp.1983).

for at least ten years prior to his election, and no person may ... be elected ... judge ... unless he has been admitted to practice law for at least five years prior to his election." *See State ex rel. Haught v. Donnahoe,* 174 W.Va. 27, 321 S.E.2d 677 (1984). Granting prior military service credit to members of the judiciary participating in the judicial retirement system enhances the inducement for the pool of talent from which professionals may be drawn to judicial service, and serves the fundamental constitutional interest of attracting and retaining professional talent in order to maintain the integrity of an independent judiciary. Severing the unconstitutional phrase "any portion of the term of office of any judge of a court of record which shall have elapsed while such judge was on" leaves "In determining eligibility for the benefits provided by this section ... active duty ... in the armed forces of the United States shall be considered as served ...." Accordingly, we limit the scope of our holding in conformance with the severability statutes and case law and the presumed intent of the legislature, and hold that military service, or its equivalent,[27] rendered during a period of compulsory military service,[28] "shall be considered as served" under West Virginia Code § 51–9–6 (1981 Replacement Vol.), for the

purpose of determining eligibility for disability and retirement benefits.[29]

With respect to the prosecuting attorney service credit provision, we apply the severability statutes and case law, as in the case of the military service credit provision, in order to accommodate the presumed legislative intent. In *Peters v. Narick,* 165 W.Va. 622, 270 S.E.2d 760, 767 (1980), this Court applied the least intrusive remedy approach to a similar problem and, rather than denying benefits to the intended class, included under its coverage those "aggrieved by exclusion."[30] *See also* Syl. pt. 4, *State ex rel. Alsop v. McCartney,* 159 W.Va. 829, 228 S.E.2d 278 (1976). Similarly, this Court applied the doctrine of "neutral extension" in *Adkins v. McEldowney,* 167 W.Va. 469, 280 S.E.2d 231, 233 (1981), to permit illegitimate children to inherit from both their father and their mother. *See also Jones v. Heckler,* 460 U.S. 1077, 103 S.Ct. 1763, 76 L.Ed.2d 339 (1983); *Jones v. Heckler,* 712 F.2d 924 (4th Cir.1983). As in the case of a military service credit provision, granting governmental service credit enhances the inducement for the pool of talent from which professionals may be drawn to judicial service,[31] and serves the fundamental constitutional interest of attracting and maintaining professional talent in order to maintain

**27.** *See, e.g.,* 50 U.S.C.App. § 456(j) (1982).

**28.** The period of compulsory military service in question runs from September 16, 1940 to July 1, 1973. *See* Selective Training and Service Act of 1940, ch. 720, 54 Stat. 885; Military Selective Service Act, ch. 625, 62 Stat. 604 (1948); Universal Military Training and Service Act, ch. 144, 65 Stat. 75 (1951). Military Selective Service Act of 1967, Pub.L. No. 90–40, 81 Stat. 100. The federal government's general induction authority expired in July 1, 1973. *See* 50 U.S.C.App. § 467(c) (1982).

**29.** In two of our State's three other retirement systems, we note that the Legislature has limited the grant of military service credit to five years. *See* West Virginia Code § 5–10–5 (1979 Replacement Vol.); West Virginia Code § 15–2–28(b) (1979 Replacement Vol.). Therefore, the Administrative Director should be guided by the general legislative policy that prior military service credit be limited to five years.

**30.** This language in *Peters* was quoted from Justice Harlan's concurrence in *Welsh v. United States,* 398 U.S. 333, 361, 90 S.Ct. 1792, 1807–08, 26 L.Ed.2d 308, 331 (1970), where he stated:

Where a statute is defective because of underinclusion there exist two remedial alternatives: a court may either declare it a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion. Cf. *Skinner v. Oklahoma,* 316 U.S. 535 [62 S.Ct. 1110, 86 L.Ed. 1655] (1942); *Iowa-Des Moines National Bank v. Bennett,* 284 U.S. 239 [52 S.Ct. 133, 76 L.Ed. 265] (1931).

**31.** We note that other jurisdictions grant retroactive governmental service credit in their judicial retirement system statutes. *See, e.g.,* Ala. Code §§ 12–18–8(a), –8.1, –55(c), and –110 (1977 & Supp.1984); Cal.Gov't ·Code § 75030.5 (West 1976); Conn.Gen.Stat.Ann. § 51–50a (West Supp.1984); Fla.Stat.Ann. § 121.081 (West 1982); Hawaii Rev.Stat. §§ 88–51, –58, and –60 (1976); Ill.Ann.Stat. ch. 108½, §§ 18–112(a)–(f) (Supp.1984); Ky.Rev.Stat.Ann. § 21.375 (Bobbs-Merrill Supp.1984); La.Rev.Stat.Ann. § 13:17 (West 1983 & Supp.1984); Mass.Gen.Laws Ann. ch. 32, § 4 (West Supp.1984); Mich.Comp.Laws Ann. §§ 38.802(f), .810, and .813b (West Supp. 1984); N.J.Stat.Ann. §§ 43:6A–9, –9.1, –9.2, –9.6,

the integrity of an independent judiciary. Severing the unconstitutional phrase "as prosecuting attorney in any county" leaves "if a judge of a court of record has served for a period of not less than ten full years ... any portion of time which he had served ... in [32] this State shall qualify as years of service." Accordingly, we limit the scope of our holding in conformance with the severability statutes, case law, and the presumed intent of the Legislature, and hold that service to this State or any of its political subdivisions [33] "shall qualify as years of service" under West Virginia Code § 51–9–6 (1981 Replacement Vol.).

West Virginia Code § 51–9–4 (1981 Replacement Vol.) requires that, "[e]very person who ... shall serve as a judge of any court of record ... shall pay into the ... fund six percent of ... his total salary ...." Furthermore, when a judge claims credit for a period during which he was not a contributing member of the judicial retirement system, he must pay "into the ... fund all contributions he would have been required to pay into the fund, together with interest thereon at four percent...." [34] West Virginia Code § 51–9–5 (1981 Replacement Vol.); see also West Virginia Code § 51–9–6 (1981 Replacement Vol.). These provisions reflect a clear legislative intent that all credited service in the judicial retirement system must correspond to contributions made to the fund by judges claiming such credit.[35]

### VIII

From 1949, when the judicial retirement system was created, see 1949

-10, -11, and -14.2 (Supp.1984); N.M.Stat.Ann. §§ 10–13–6—9 (1983); N.Y.Retire. & Soc. Sec.Law §§ 2(11), 41, and 42 (1971 & Supp. 1983); N.D.Cent.Code § 54–52–02.6 (1982); Ohio Rev.Code Ann. §§ 145.20, .29, .29.3, and .201 (Page 1984); 71 Pa.Cons.Stat.Ann. § 5304 (Purdon Supp.1984); S.C.Code Ann. § 9–8–50(1) (Supp.1983); S.D. Codified Laws §§ 3–12–83—84 (1980); Vt.Stat.Ann. tit. 3, §§ 458(a) and 477 (Supp.1983); Wash.Rev.Code Ann. (Supp.1984); Wis.Stat.Ann. §§ 40.02(16)—(17) (Supp.1983).

32. "In" connotes service to the State of West Virginia or any of its political subdivisions. The Administrative Director should view the word "in" to mean "political subdivision" as defined in the public employees retirement system statute. See West Virginia Code § 5–10–2(4) (1979 Replacement Vol.).

33. Retroactive governmental service in this State includes full or part time service, whether by employment, election, or appointment, to the State of West Virginia or any of its political subdivisions. See footnote 37 intra. We note the definition of "political subdivision" contained in the public employees retirement statute:

"Political subdivision" means the State of West Virginia, a county, city or town in the State; a school corporation or corporate unit; any separate corporation or instrumentality established by one or more counties, cities or towns, as permitted by law; any corporation or instrumentality supported in most part by counties, cities or towns; any public corporation charged by law with the performance of a governmental function and whose jurisdiction is coextensive with one or more counties, cities or towns, any agency or organization established by, or approved by the department of mental health for the provision of community health or mental retardation services, and which is supported in part by state, county or municipal funds.
West Virginia Code § 5–10–2(4) (1979 Replacement Vol.).

34. This is strikingly different from the grant of military service credit contained in this State's other retirement systems, where such credit is given as a bonus for military service. See West Virginia Code § 5–10–15 (1979 Replacement Vol.) (public employees); West Virginia Code § 15–2–28 (1979 Replacement Vol.) (department of public safety); West Virginia Code § 18–7A–17 (Supp.1984) (teachers).

35. Because claiming retroactive service credit involves a time period during which a judicial salary was not received, some basis for calculating the level of contribution necessary to claim such service credit is needed. We note that West Virginia Code § 51–2–12 (1981 Replacement Vol.) establishes a per diem level of compensation for "special" judges of courts of record. The per diem rate of compensation for special judges has been $100.00 since 1975. See 1975 W.Va.Acts ch. 126. Prior to the most recent amendment to West Virginia Code § 51–2–12 (1981 Replacement Vol.), the per diem rate of compensation for special judges has progressively increased. See 1973 W.Va. Acts ch. 34; 1951 W.Va.Acts ch. 57; 1921 W.Va. Acts ch. 77; W.Va.Acts ch. 21; and 1872–73 W.Va.Acts ch. 129. Under West Virginia Code §§ 2–2–1 and -2 (1979 Replacement Vol. & Supp.1984), "a Saturday, Sunday or legal holiday" are not general work days. See State ex rel. Varney v. Ellis, 149 W.Va. 522, 142 S.E.2d 63 (1965). Thus, a state work year consists of approximately two hundred and fifty working

W.Va. Acts ch. 34, until 1953, judges who initially elected not to participate in the judicial retirement system were both exempt from participation in any public retirement system [36] and precluded from subsequent participation in the judicial retirement system. *See* West Virginia Code § 51–9–5 (1949). In 1953, *see* 1953 W.Va. Acts ch. 54, a proviso was added to this election provision which permits a judge who initially elects not to participate in the judicial retirement system to subsequently become eligible for benefits under the system "by paying into the judges' retirement fund all contributions he would have been required to pay into the fund, together with interest thereon at four per cent, if he had not previously elected not to contribute." *See* West Virginia Code § 51–9–5 (1955). Still, election not to contribute meant exemption from participation in any other public retirement system. In 1961, however, *see* 1961 W.Va. Acts ch. 118, the public employees retirement system was created,[37] which makes participation, as previously noted, mandatory for all individ-

days. Therefore, the basis for calculating contribution to the judicial retirement fund for a judge claiming military or governmental service credit for time served in 1949 would be $15.00 multiplied by 250 working days or $3750.00. The judge would then contribute six percent of this amount to the fund plus four percent interest for any period following eligibility to claim such prior military or governmental service credit. A judge who claimed his or her military service credit when entering judicial office for time served in 1949 would therefore be required to contribute $225.00 to the judicial retirement fund. If the same judge, however, waited until a later date to claim such credit, he or she would be required to contribute ten percent of base, or $375.00.

Unlike military service credit, which is available immediately upon entry into the judicial retirement system, governmental service credit can be claimed only after ten years of service credit. *See* West Virginia Code § 51–9–6 (1981 Replacement Vol.).

**36.** They were exempt from participating in any public retirement system because there were no other public retirement systems in existence in which they were eligible to participate. The public employees retirement system was not created until 1961. *See* 1961 W.Va.Acts ch. 118.

**37.** The public employees retirement system is designed primarily for executive branch employees of the State and its political subdivisions. It provides a system whereby legislatively defined "employees" accumulate creditable service for "full-time" employment. *See* West Virginia Code § 5–10–2(6) (1979 Replacement Vol.). The section defining the term "employee," however, also contains a special exceptional grant of status to certain legislative officers and employees who receive full-time credit despite only rendering part-time service: "Provided, that members of the state legislature, the clerk of the house of delegates, the clerk of the state senate, members of the legislative body of any political subdivision and judges of the state court of claims shall be considered to be employees ...." West Virginia Code § 5–10–2(6) (1979 Replacement Vol.). Therefore, the public employees retirement system statute creates a special exceptional class of employees and officers who are only required to serve a limited number of working days each year, ranging from sixty days in the case of legislators, *see* West Virginia Constitution art. VI, § 18; to four days in the case of county commissioners, *see* West Virginia Constitution art. IX, § 9; to no numerical meeting requirements in the case of city council members, *see* West Virginia Code §§ 8–9–1–3 (1984 Replacement Vol.), while all judicial officers are required to account for approximately two hundred fifty days each year. *See* West Virginia Code § 51–1–17(b) (Supp. 1984).

For these officers and employees, the public employees retirement system operates to create multipliers. Such multipliers are not uncommon in retirement systems. *See, e.g.,* Virginia Code § 51–163(c) (1982). A review of the public employees retirement system reveals that there are at least three multipliers at work. First, a multiplier, explicitly denominated as such, is utilized in computing the "final average salary" of legislators under West Virginia Code § 5–10–2(15) (1979 Replacement Vol.). *See* *Campbell v. Kelly,* 157 W.Va. 453, 202 S.E.2d 369 (1974). Second, a multiplier is implicitly utilized in crediting "members of the state legislature, the clerk of the house of delegates, the clerk of the state senate, members of the legislative body of any political subdivision and judges of the state court of claims" with full-time credit for part-time service under West Virginia Code § 5–10–2(6) (1979 Replacement Vol.). This multiplier has been extended by rule to include sergeants-at-arms, clerks, and doorkeepers of the legislature. *See* Rule 50 of Rules and Regulations Adopted by the Board of Trustees of the West Virginia Public Employees Retirement System (1978). *See also* Rule 41 of the Rules and Regulations Adopted by the Board of Trustees of the West Virginia Public Employees Retirement System (1978) (full-time service credit for part-time deputy assessors). For legislators, the multiplier operates to grant two hundred fifty days' credit for sixty days of actual service, or a multiplier of approximately 4:1; for county commissioners, the multiplier operates to grant two hundred fifty days' credit for four days of

uals included within the statutory definition of employees. *See* West Virginia Code § 5–10–17(a) (Supp.1984). Therefore, rather than resulting in a complete exemption from participation in any retirement system, election not to participate in the judicial retirement system under West Virginia Code § 51–9–5 (1981 Replacement Vol.) means mandatory participation in the public employees retirement system. Thus, the public employees retirement system is a "substituted" retirement system for Article VIII judicial officers under West Virginia Constitution art. VIII, § 8.

As previously noted, West Virginia Code § 51–9–5 (1981 Replacement Vol.) permits a judge to transfer from the public employees retirement system into the judicial retirement system "by paying into the judges' retirement fund all contributions he would have been required to pay into the fund, together with interest thereon at four percent, if he had not previously elected not to contribute."[38] This occurs by operation of West Virginia Code § 51–9–5 (1981 Replacement Vol.) and the "substituted" nature of the public employees retirement system under West Virginia Constitution art. VIII, § 8. It is the result of administrative recognition that the respective retirement systems were developed independently, at different times,[39] for different purposes, and that accommodation in the administration of the two systems is necessary in order to fully effectuate the presumed legislative intent.[40]

In effect, judges who transfer from the public employees retirement system into the judicial retirement system are considered to have terminated their membership in the public employees retirement system under West Virginia Code § 5–10–18 (Supp.1984). Under West Virginia Code § 5–10–30(a) (1979 Replacement Vol.) the judge involved receives a refund of accumulated contributions, together with the total interest credited to his or her account if a member of the public employees retirement system for more than two years, which he or she must then deposit, together with additional contributions necessary in order to meet the ten percent of salary requirement under West Virginia Code § 51–9–5 (1981 Replacement Vol.), into the judicial retirement fund. The judge then receives service credit for time served as a member of the judiciary. Of course, once a member of the judicial retirement system, a judge may make such contributions as are necessary to receive

---

actual service, or a multiplier of approximately 60:1; for city council members, the multiplier operates to grant two hundred fifty days' credit for X days of actual service, or a multiplier of X:1. Finally, by operation of West Virginia Code § 5–10–17(b) (Supp.1984) and West Virginia Code § 18–7A–17 (Supp.1984), members of the teachers retirement system who are also members of the legislature may receive two years of service credit for every one year of public service rendered, or a multiplier of 2:1.

**38.** This ability to transfer credit from the public employees retirement system into another retirement system is not unique to members of the judiciary. Under West Virginia Code § 5–13–3(c) (1979 Replacement Vol.), "in the event a member leaves a position covered by the public system and becomes employed in a position covered by the teacher system, he shall not forfeit his credited service acquired as a member of the public system ...." *See also* West Virginia Code § 5–13–5(b) (1979 Replacement Vol.).

**39.** Compared to West Virginia Constitution art. VIII, § 8, which was ratified as part of the Judicial Reorganization Amendment of 1974, both the judicial and public employees retirement statutes are relatively antique enactments. Furthermore, neither have been amended to accommodate the constitutionalization of judicial retirement.

**40.** This administrative overlay or patchwork approach has developed as a means of filling in the interstices between the statutory provisions of the respective retirement systems. This process, however, is not without difficulty. For example, the board of trustees of the public employees retirement system commonly, although perhaps unknowingly, does not follow its own formal rules and regulations. Notably, Rule 21.8 of the Rules and Regulations Adopted by the Board of Trustees of the West Virginia Public Employees Retirement System (1978), provides that, "Any employee of a participating employer who is eligible for membership in another retirement system of a political body shall not be eligible for membership in the West Virginia Public Employees Retirement System." Furthermore, provisions of Rules 6, 21, and 22 of the Rules and Regulations Adopted by the Board of Trustees of· the West Virginia Public Employees Retirement System (1978) appear, on their face, to contradict statutory provisions.

credit for governmental and military service as previously discussed.

This system develops as an accommodation to the legislative intent that judges may not be precluded from participation in the judicial retirement system because of initial election not to participate and that the public employee retirement system serves as a mandatory "substituted" retirement system under West Virginia Constitution art. VIII, § 8 for judges who do initially elect not to participate in the judicial retirement system. Furthermore, the system develops in recognition of the fact that many of those entering judicial service do so after having served the State or one of its political subdivisions immediately prior to the commencement of such service, and indeed may have been members of the public employees retirement system in connection with such governmental service. Therefore, it follows that those entering the judicial service might initially remain in the public employees retirement system.

■ As noted, judges who leave the public employees retirement system and enter the judicial retirement system must be considered to have terminated their membership under West Virginia Code § 5–10–18 (Supp.1984) in the public employees retirement system.[41] West Virginia Code § 5–10–18 (Supp.1984) provides, in pertinent part, that, "When a member leaves the employ of a participating employer ... he ceases to be a member and forfeits service credited to him at that time." Therefore, a judge is considered to have left the employ of a participating employer when he transfers into the judicial retirement system. The statute further provides, however, that, "If he becomes reemployed by a participating public employer he shall be reinstated as a member of the retirement system and his credited service last forfeited by him shall be restored to his credit." Thus, particularly

given the nature of the public employees retirement system as a "substituted" system for judges under our constitution, judges who either initially or subsequently elected to participate in the judicial retirement system may transfer into the public employees retirement system.

■ The second proviso to West Virginia Code § 5–10–18 (Supp.1984) requires an individual reentering the public employees retirement system to return "to the members' deposit fund the amount, if any, he withdrew therefrom, together with regular interest thereon from the date of withdrawal to the date of repayment." In addition, judges would be required to contribute to the members' deposit fund the amount which would have been contributed had they not elected to participate in the judicial retirement system, together with regular interest thereon, as established by the board of trustees of the public employees retirement system, from the date of withdrawal to the date of reentry. If the judge who wishes to transfer from the judicial retirement system to the public employees retirement system has not previously been a member of the public employees retirement system, the judge would be required to contribute the amount which would have been contributed had he or she not initially elected to participate in the judicial retirement system, together with interest thereon, as established by the board of trustees of the public employees retirement system, from the date of commencement of judicial service until transfer into the public employees retirement system. It should be noted that unnecessary transfers between the systems are discouraged through the imposition of interest penalties upon transfer. *See* West Virginia Code §§ 51–9–5 (1981 Replacement Vol.) and 5–10–18 (Supp. 1984). This is particularly true in transfers from the judicial retirement system to the public employees retirement system be-

---

**41.** This ability to transfer credit from the judicial retirement system into the public employees retirement system is similar to the ability to transfer credit from the teachers retirement system into the public employees retirement system. In this regard, West Virginia Code § 5–13–3(b) (1979 Replacement Vol.) provides

that, "in the event a member leaves a position covered by the teacher system and becomes employed in a position covered by the public system, he shall not forfeit his credited service acquired as a member of the teacher system ...." *See also* West Virginia Code § 5–13–5(a) (1979 Replacement Vol.).

cause West Virginia Code § 51–9–12 (1981 Replacement Vol.) provides that contributions refunded from the judicial retirement system shall be done so "without interest." [42]

As we have already stated, the Administrative Director of the Supreme Court of Appeals is the constitutional judicial officer charged by this Court with the maintenance, administration, and certification of judicial salary and retirement records. It is his duty to certify all service credit for judges of courts of record to proper administrators, specifically including those responsible for the administration of the respective retirement systems in which judges may participate. It is his duty to assist judges of courts of record in calculating the level of contribution necessary to obtain the credit desired from the respective retirement systems. It is his duty to calculate the employers' contribution necessary to transfer credit between the systems based upon what the employers' contribution would have been if the judge who desires transfer had been a member of the system into which he or she is transferring. Finally, it is his duty to calculate contributions required of judges in either system who wish to claim credit for prior governmental or military service.

The "substituted" nature of the public employees retirement system as it applies to judges is the foundation for the degree of transferability between the judicial and public employees retirement systems. Primarily, the ability of Article VIII judicial officers to participate in the public employees retirement system derives from a legislative accommodation of the nature of judicial and public service. Although there are many distinctions between the two systems which are merely matters of degree, one important difference between the two systems that may be applicable to Judge Dostert is governmental and military service credit.

■ Under the public employees retirement system, "prior" service credit is limited to service rendered prior to July 1, 1961. *See* West Virginia Code §§ 5–10–2(11) and 5–10–14(a) (1979 Replacement Vol.). As we have stated, retroactive governmental service credit is available under the judicial retirement system for any governmental service in this State, that is, to any of its political subdivisions as defined under West Virginia Code § 5–10–2(4) (1979 Replacement Vol.). Therefore, under the judicial retirement system, there are no temporal limitations on the credit granted for governmental service. Given the degree of transferability between the judicial and public employees retirement systems, fundamental equal protection dictates that judges obtaining retroactive governmental service credit receive equal treatment under both systems, particularly given the "substituted" nature of the public employees retirement system as it applies to judges. Otherwise, members of the judicial retirement system who wish to transfer into the public employees retirement system would be denied and forced to forfeit qualifying creditable service under the judicial retirement system. Such denial and forfeiture would impair the contractually vested property rights of those judges who wish to transfer.

---

**42.** We note that under West Virginia Code § 51–9–12 (1981 Replacement Vol.), "refunds" are limited to judges "whose services have terminated, otherwise than by retirement under provisions of this statute." Because judges who wish to transfer from the judicial retirement system into the public employees retirement system must contribute to the public employees retirement system fund all contributions which would have been contributed had they not elected to participate in the judicial retirement system, however, the reimbursement of contributions made to the judicial retirement system fund is not a "refund" within the meaning of the term as utilized in West Virginia Code § 51–9–12 (1981 Replacement Vol.). This statute is concerned exclusively with the repayment of contributions upon termination of judicial service. It does not address the transfer of service credit by a judge who continues to serve as a member of the judiciary into the public employees retirement system. Because the legislature has not specifically provided for the reimbursement of accumulated contributions under the judicial retirement system with interest, however, such reimbursements of accumulated contributions must be done so without interest, particularly given the clear legislative intent that "refunds" are to be made "without interest."

In Syllabus Point 1 of *Wagoner v. Gainer, supra,* this Court held that, "The West Virginia Retirement System for Judges creates contractually vested property rights for retired and active participating plan members, and these rights are enforceable and cannot be impaired or diminished by the State." These rights would not become unenforceable and capable of impairment merely because a member of the judicial retirement system elected to take advantage of the option to participate in a "substituted" retirement system, the public employees retirement system. We also note that the operation of multipliers, of which we have spoken, in the public employees retirement system to provide certain nonexecutive branch officers and employees with full-time service credit for part-time service applies with equal force to members of the judiciary, who are entitled to annual service credit for service in the state or any of its political subdivisions, as provided in the special exceptional provision of West Virginia Code § 5–10–2(6) (1979 Replacement Vol.) and Rule 50 of the Rules and Regulations Adopted by the Board of Trustees of the West Virginia Public Employees Retirement System (1978). Accordingly, retroactive service credit under the public employees retirement system shall be available, as under the judicial retirement system, for service rendered by a judge to this State or any of its political subdivisions prior to becoming a judicial member of the public employees retirement system, irrespective of when such service was rendered.

### IX

The final issue for determination in this case is whether the constitutional standard for judicial disability applies in disability proceedings involving judges who are members of the public employees retirement system. As previously noted, Judge Dostert is currently a member of the public employees retirement system. Because of the participatory option contained in the judicial retirement statute, however, it has been made necessary to examine the issue of eligibility for disability benefits under both systems.

This final observation conforms with the language of West Virginia Constitution art. VIII, § 8, which provides that, "[T]he supreme court of appeals is authorized to ... retire any ... judge ... who is eligible for retirement benefits under the West Virginia judges' retirement system (*or any successor or substituted retirement system for ... judges ....*)" (Emphasis added). The public employees retirement system is a "substituted" system within the meaning of this constitutional provision. Under the judicial retirement system, a judge must generally have ten years of creditable service in order to qualify for disability benefits.[43] *See* West Virginia Code § 51–9–8 (1981 Replacement Vol.). We note that Judge Dostert has currently served less than one full eight year term as circuit judge. Therefore, on the face of the statute, he must demonstrate two additional years of prior creditable service, as discussed herein, before he is "eligible" for retirement benefits under the judicial retirement system. Under the public employees retirement system, a member must also serve "ten or more years" in order to qualify for disability benefits, unless his or her disability is "the natural and proximate result of a personal injury or disease arising out of and in the course of his actual performance of duty in the employ of a participating public employer, and ... he is in receipt of workmen's compensation on account of such physical or mental disability." *See* West Virginia Code §§ 5–10–25(a)—(b) (1979 Replacement Vol.). Therefore, on the face of the statute, Judge Dostert must be successful in his claim for workers' compensation benefits before he will be "eligible" for disability retirement benefits under the statutory standards of the public employees retirement system. This proposition, however, ignores the fact that, under West Virginia Constitution art. VIII, § 8, it is "the supreme court of appeals"

---

**43.** As previously noted, however, a judge who is over sixty-five years of age must only serve six years in order to qualify for disability benefits.

*See* West Virginia Code § 51–9–6a (1981 Replacement Vol.).

and not the Workers' Compensation Commission or the Board of Trustees of the Public Employees Retirement System, who determines the existence of Article VIII judicial disability.

 Under West Virginia Constitution art. VIII, § 8, any judge "who ... should not, in the opinion of the supreme court of appeals, continue to serve as a ... judge [because of advancing years and attendant physical or mental incapacity]," may be involuntarily retired due to disability, irrespective of which retirement system such judge is a member. The issue in a judicial disability retirement proceeding is a question of who "should not," in the opinion of this Court, continue to perform those judicial duties as the result of physical or mental incapacity. Work-relatedness, unlike in the public employees retirement system context, is not a prerequisite to a determination of judicial disability in the disciplinary context. Therefore, irrespective of the disposition of Judge Dostert's workers' compensation claim, the Judicial Hearing Board, upon remand, has jurisdiction to recommend disability retirement under the public employees retirement system or under the judicial retirement system, if he elects to transfer and is otherwise eligible for benefits, if it finds he should not continue to perform judicial duties as a retired judge as the result of his "advancing years and attendant physical or mental incapacity." [44] If the Judicial Hearing Board finds the existence of judicial disability, the Administrative Director should calculate the actuarial value of Judge Dostert's benefits under the judicial retirement system pursuant to West Virginia Code § 51–9–8 (1981 Replacement Vol.) or under the public employees retirement system pursuant to West Virginia Code § 5–10–26(c) (1979 Replacement Vol.), as the case may be depending upon Judge Dostert's eligibility for benefits under the respective systems.

Accordingly, we direct the Administrative Director to calculate the Judge's creditable service and to certify that service to the respective retirement systems as the case need be. Additionally, we remand this disciplinary proceeding to the Judicial Hearing Board for immediate disposition of the ethical complaint and with an emphasis upon determining the existence of judicial disability.

Remanded with directions.

MILLER, Justice, in regard to my disqualification:

I file this note to explain my disqualification. In April of this year, I was subpoenaed and testified as a material State's witness in the criminal contempt trial in which Judge Dostert was the defendant. This trial was held in the Circuit Court of Kanawha County and resulted in Judge Dostert's conviction for criminal contempt. The present proceeding is a direct outgrowth of that conviction since it involves a claimed breach of the Judicial Code of Conduct arising from the same facts which gave rise to the criminal contempt convic-

---

44. We note that other jurisdictions apply a similar standard in judicial disability disciplinary retirement cases. *See, e.g., In re Falk,* 300 So.2d 260 (Fla.1974); *In re Alexander,* 323 So.2d 448 (La.1973); *Matter of Anderson,* 312 Minn. 442, 252 N.W.2d 592 (Minn.1977); *Quinn v. State Commission on Judicial Conduct,* 54 N.Y.2d 386, 430 N.E.2d 879, 446 N.Y.S.2d 3 (1981); *Ohio State Bar Association v. Mayer,* 54 Ohio St.2d 431, 8 O.O.3d 434, 377 N.E.2d 770 (Ohio 1978); *Lavender v. Woodliff,* 605 P.2d 1338 (Okla.1979); *Matter of Field,* 281 Or. 623, 576 P.2d 348 (Ore. 1978). This standard is also reflected in definitions of disability contained within other state judicial retirement system statutes. *See, e.g.,* Ala.Code §§ 12–18–6(a)(1) and –6(b)(1) (Supp. 1984); Ark.Stat.Ann. § 22–902 (Supp.1983); Cal. Gov't Code § 75060 (West 1976); Colo.Rev.Stat. § 24–51–609 (Supp.1983); Fla.Stat.Ann. § 121.091 (West 1982); Ga.Code Ann. § 47–9–72 (Supp.1984); Ill.Ann.Stat. ch. 108½, § 18–126.1 (Supp.1984); Ind.Code Ann. § 33–13–8–11 (Burns 1975); Iowa Code Ann. § 602.9112 (West Supp.1984); Mass.Gen.Laws Ann. ch. 32, § 6 (West Supp.1984); Minn.Stat.Ann. §§ 490.-025(1) and .121(13) (Supp.1984); Miss.Code Ann. § 25–11–113 (Supp.1983); Mo.Ann.Stat. § 476.445 (Vernon Supp.1984); N.J.Stat.Ann. § 43:6A–12 (Supp.1984); N.M.Stat.Ann. § 10–12–3 (Supp.1983); N.C.Gen.Stat. §§ 7A–39.11 and –55 (1981); Or.Rev.Stat. § 1.310(c) (1983); Tenn.Code Ann. §§ 8–34–115, –127, and –143 (1980); Tex.Rev.Civ.Stat.Ann. art. 44.201 (Vernon Supp.1983); Utah Code Ann. § 49–7a–7(21) (Supp.1983); Vt.Stat.Ann. tit. 3, § 460 (Supp.1983); Va.Code § 51–169 (1982); Wash.Rev.Code Ann. §§ 2.10.120(1) and 2.12.-020 (Supp.1984).

tion. It is conceivable that I may be called as a material witness in this judicial disciplinary proceeding.

The Judicial Code of Conduct clearly forecloses a judge from sitting in a case in which he has been a prior participant or could be called as a material witness.* There are numerous cases holding that disqualification exists under these circumstances. *E.g., Tyler v. Swenson*, 427 F.2d 412 (8th Cir.1970); *Tanner v. Travelers Ins. Co.*, 389 So.2d 721 (La.App.1980); *Davis v. State*, 598 S.W.2d 582 (Mo.App. 1980); Annot., 22 A.L.R.3d 1198 (1968); *cf. Stern Bros., Inc. v. McClure*, 160 W.Va. 567, 236 S.E.2d 222 (1977).

NEELY, Justice dissenting:

It is with considerable reluctance that I respectfully but vigorously dissent to the Court's opinion in this matter. My reluctance proceeds from the glaring inequities of the judicial retirement system and the diminishing chances that in the ordinary course of things those inequities will be addressed by the Legislature. Therefore, before proceeding to my specific legal grounds for dissent I shall address the reasons for my reluctance.

I

Every year American law schools graduate approximately 35,000 new lawyers. These yearly increases in lawyers far exceed either replacement requirements or the needs of a growing economy. In West Virginia, for example, the number of practicing lawyers has increased by about sixty percent in the last fifteen years although the population has declined and the economy, dominated as it is by coal and steel, has actually contracted. Yet most of our new lawyers are still able to get jobs either practicing law or working in a law-related field like government. The least talented new lawyers may be unemployed for awhile, but eventually, even they will get better jobs than had they not gone to law school.

The job opportunities for lawyers reflect both annual increases in traditional litigation and a recent tendency for other institutions, such as government agencies, universities, and business to emulate the judicial system in making decisions. For example, teachers cannot be fired without elaborate, court-like, "due process" hearings, *W.Va. Code*, 18A–2–8 [1969]; *DeVito v. Board of Educ.*, 173 W.Va. 396, 317 S.E.2d 159 (1984); *Wilt v. Flanigan*, 170 W.Va. 385, 294 S.E.2d 189 (1982); *Mason Cty. Bd. of Ed. v. State Supt. of Sch.*, 165 W.Va. 732, 274 S.E.2d 435 (1980), and a humble state agency like our Board of Barbers and Beauticians cannot alter policy to allow barbers to give permanent waves without a ceremony that would do the Old Bailey proud. *Wheeling Barber College, etc., et al. v. Roush, etc., et al.*, 174 W.Va. 43, 321 S.E.2d 694 (1984). Both the larger volume of traditional litigation and the tendency to copy the courts in a multitude of non-judicial settings are symptoms of a basic structural transformation in American government that places progressively more matters in the courts for decisions.

In a typical year over twelve million cases are filed in general jurisdiction courts in the United States.[1] We cannot even count the scores of millions more cases filed in small claims and other minor courts. The largest percentage of all cases are either settled or decided according to well established principles, but every year more and more cases are filed inviting courts to change some time-honored part of our socio-economic system.

---

* Canon 3(C) provides, in relevant part:

"(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) ... the judge ... has been a material witness concerning it;
\* \* \*
(d)(iv) is to the judge's knowledge likely to be a material witness in the proceeding."

1. *See The Role of Courts in American Society,* the final report of The Council on the Role of Courts, West Publishing Company (St. Paul, MN: 1984).

Employees file cases seeking greater job security; parents want courts to give them the money for schools that they can't get from legislatures; injured workers demand more money than legislatures have given them under workers' compensation; and, people who view themselves as underprivileged—particularly women, minorities and the poor—want courts to redistribute wealth and power in their favor. These groups, and others too numerous to name, come to court because courts are faster, cheaper, and less influenced by the power of money than other lawmakers.

Courts have probably been chosen for an expanded lawmaking rôle because they are more adaptable than other political institutions for solving problems at this particular stage of our social development. Among these problems is a technology, increasingly widespread and complex, that has made society ever more interdependent. Additionally, in the last twenty years our consensus on the proper distribution of wealth and power in the community has changed dramatically. The most obvious beneficiaries of this transformed consensus are blacks, women and the poor, but there are more subtle changes as well that rearrange older, time-honored power relationships.

The divorced household, for example, is now as acceptable as the married household. This places an unprecedented number of family matters into the hands of the courts. Sources of moral authority, such as churches, parents, employers and schools that were given weight twenty years ago when we were a more traditional society, are declining in strength as America becomes less cohesive. This, in turn, leads people to the courts to resolve problems that were formerly resolved elsewhere. The need for regulation has placed more aspects of everyone's life at the mercy of anonymous and unconcerned bureaucrats who, so far, can be brought to heel only by the courts. The efficiencies and low prices of large-scale enterprises have augmented the power of professional management at the expense of individual ownership because large-scale enterprise requires a modern corporation. But corporations are divorced from traditional sources of community control and thus people go to court to control them rather than to a local, individual owner.

Technology has made us interdependent: our own jobs often depend on the investment decisions of anonymous corporate managers; our children's education depends on public schools, and this is particularly true as single-parent families and two-income families provide less parental guidance; recreational opportunities depend on public facilities; health depends on hospitals, doctors and government rules; the value of our property depends on zoning laws; and, our incomes depend on government grants, subsidies and tax breaks. Today we do not even die at home; we go to nursing homes for professional death management.

Throughout America big business is replacing small business. In manufacturing, most consumer products—cars, appliances, drugs and even housing—are made by huge, efficient and well-capitalized corporations. Small restaurants are gobbled up by the fast food chains; local stores are being forced out by discounters; and, local banks are being replaced by state-wide banks operated locally by indifferent strangers selected from a central management pool. We have developed institutions like American Express, Mastercard and Visa which, by denying us creditcards, can foreclose us from renting a car or checking into a hotel. In short, unlike our grandfathers who were born, lived and died in a nation of self-reliant farmers and small entrepreneurs, we are increasingly under the power of others.[2]

Judges, then, often despite themselves, are being pushed into more and more functions in order to protect citizens from the caprice—often unintentional—of anonymous institutions. Sometimes the judges are wrong, but as the magnitude and breadth of our interdependence increases annually, we intensify our search for pro-

2. At the conclusion of World War II over 17 percent of the American population were farmers. By 1982 the farm population had dropped to 2.6 percent.

tection from impersonal and apparently uncontrollable forces like corporations and governments. People have found such shelter in the courts, which give them leverage against those with power over them and mitigate the caprice of major institutions. People turn to the courts both to widen their participation in a society increasingly dominated by experts like school administrators, welfare workers and bureaucrats and to provide a buffer against all sorts of decisions that adversely affect their lives.[3]

Courts are ultimately a refuge for everyone—from International Harvester who wants to slacken the pace of environmental regulation to John Kelly [*Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)] who wants his welfare benefits restored—because courts are comparatively inexpensive, decisive, fast, and honest. The irony of this wholesale transfer of authority to courts is that the people who most consistently vilify the courts are still the first to use them. Business, for example, goes to court at the first sign of an adverse decision by an administrative agency. The social welfare constituencies go to court to get judges to pry more money from reluctant legislatures for social programs like mental hospitals, juvenile facilities, prisons, and welfare; legislators use the courts for their dirty work by passing deliberately vague statutes and then blaming the judges for interpretations that adversely affect their constituents; and presidents, governors, and mayors use court decisions as shields against public outrage over such socially explosive issues as abortion and integration. Yet most of these groups claim to hate the courts!

We now appear to have in America what the sociologists' tortured jargon calls a lack of "attitude-behavior congruence." If you ask the average American what he thinks of democracy he will extol its virtues. Yet whenever that same American is confronted by a democratic decision adverse to his interests, he will try to get the decision overturned in the (at least arguably) undemocratic courts.

With over twelve million lawsuits filed in general jurisdiction courts each year it is difficult for judges not to be in the eye of almost every imaginable storm. Regardless of how judges rule—either making new law or declining to make new law—they will inevitably incur a host of powerful enemies. In a state like West Virginia where circuit judges are elected for eight-year terms and supreme court justices are elected for twelve-year terms we will inevitably find that more and more judges will be defeated in their bids for reelection.

Yet, as I shall attempt to explain, a judge's loss of his job is very different, in many regards, from the loss of regular governmental or private employment. In fact, the setup of our legal system almost guarantees that a judge who dies or loses his bid for reelection before he is eligible for retirement will suffer severely, both financially and emotionally, or his family will suffer.

## II

Typically a practicing lawyer becomes a judge in his mid-forties at just about the time when he is entering the peak earning years. Everything for which a practicing lawyer works in terms of building a reputation, organizing a law firm, and developing a panel of regular clients capable of paying reasonably, if not handsomely, for services, must be sacrificed the moment a lawyer goes on the bench. Furthermore, although a lawyer's ownership interest in his own private practice may be of immense economic value to him if he continues to practice, this hard-earned asset is almost valueless to anyone else and, therefore, is not a salable commodity. If, therefore, a successful practicing lawyer accepts an appointment as either a circuit judge or supreme court justice—a path to our state's judiciary that is at least as common as running for a seat in an election—the judge must abandon everything for which he worked over a typical period of fifteen years. If, then, that same judge is defeated in a bid for reelection he is put back out

---

**3.** *See The Role of Courts in American Society,* Op. cit. N. 1.

on the street without a law office, without a panel of regular fee-paying clients, and if the judge has served for a full term or more, without the youth and energy to start over again with the enthusiasm of his youth.

Furthermore, being a judge is a specialty: it is a specific, discrete metier in the law just like tax practice, administrative practice, or personal injury practice. Being a good judge demands study and attention, and that in turn forecloses a judge from devoting time to keeping up with the fields of law in which he excelled as a practicing lawyer. When, therefore, a judge is ousted from office before he is eligible to retire he finds that he is no longer even able to practice in his former specialties.

As the facts presented by the majority in this particular case fairly imply, Judge Dostert did not exactly possess a paradigmatic judicial temperament. Some, in fact, might observe that he deserved to be defeated. Nonetheless, a substantial majority of the trial court judges in this State compare favorably to the best state and federal judges throughout the United States and it is such individuals whom we must attract to the judiciary. If the retirement system for judges is so structured that it penalizes with Rhadamanthine severity anyone who is defeated in an election, it then becomes almost impossible for our judges to decide cases in any fashion contrary to the demands of ἀπόλλοι.

If the federal courts have a general reputation for handing out a brand of justice superior to the state courts, part of their reputation in that regard has been made possible by the fact that they are life tenured judges whose decisions never cause them any disastrous, or even mildly untoward personal consequences.

The current West Virginia retirement system for judges is remarkably generous for judges who ultimately qualify, especially if *W. Va. Code*, 51-9-6(c) [1979] has been, as it appears to be, rendered entirely unconstitutional by this Court in *Wagoner v. Gainer*, 167 W.Va. 139, 279 S.E.2d 636

(1981). The current system permits benefits for retired judges to be increased whenever a sitting judge receives a salary raise.

This pension is an attempt to provide judges with restitution for sacrificing their own private practices and their peak earning years in the service of the courts. Is it not a remarkable injustice that under the current statutory scheme a judge with ten years of credited service who dies must leave his family almost destitute because he has neither qualified for a judicial pension nor stored up enough private treasure to protect his family?

Furthermore, it is no answer to this latter proposition to suggest that a judge in such circumstances can elect to join the public employees' retirement system and get credit for his few years of judicial service. There are few state jobs for lawyers in the fifty-four counties of West Virginia outside of the State Capital in Kanawha County. The most common government job in an outlying county is that of the prosecuting attorney or assistant prosecuting attorney. There are a few additional positions for salaried city attorneys or roving hearing examiners for such agencies as the Workers' Compensation Fund. But in general, except for prosecutors and legislators, salaried lawyers are not the individuals with the political clout and experience to be elected judge. Very few judges, in fact, have more than a couple of years of creditable prior State service, and as time goes on even fewer will have any creditable military service. The type of lawyers whom we should be attracting to the judiciary are experienced practitioners—not paper-pushing drones from government bureaucracies—and these lawyers have organized their careers in such a way as to receive their highest dividends from the age of forty to seventy, the very years we want them as judges. Politics, being what it is, prohibits anyone from *planning* on a judicial career!

The legislature has consistently declined to revamp the judicial retirement system to eliminate the problems I have enumerated and it is unlikely that the legislature will ever do so. It appears that at least an

effective minority of legislators will consistently and indefinitely wish to punish judges for actions or decisions that they perceive as perverse or wrongheaded. Because courts have no natural constituency, then, we will inevitably continue to witness such pitiful human dramas as judges with incurable cancer struggling to live an additional few months so that their pensions can vest and their widows not be reduced to penury. And we will also continue to witness the equally pitiful political dramas of judges so fearful of being thrown penniless into the street by outraged voters that they cannot decide controversial cases with the requisite integrity and impartiality of a first-class judiciary.

### III

Nonetheless, notwithstanding all of the compelling reasons that make the majority's opinion correct from an overall social perspective, I dissent to all of the majority's specific holdings except syllabus points 4, 5, 8, and the entirely innocuous quote in syl. pt. 6. My first, and perhaps my most militant objection can be stated clearly and succinctly: *Neno debet esse judex in propria causa. W.Va. Const.*, art. VIII, § 8 provides a mechanism for avoiding this problem and at all stages when the case was in the breast of the court I urged that the art. VIII, § 8 mechanism be employed. Furthermore, this case is in no way an adversarial proceeding; the proper parties defendant, namely the Speaker of the House, the President of the Senate, and the State Auditor were not joined as parties defendant.

### IV

Although I believe that the West Virginia judicial retirement system is aberrational and randomly and senselessly unjust, it does not violate traditional precepts of equal protection. All persons contained in the class that it creates are equally treated. The classification that the retirement system uses is rationally based and bears a rational relation to a legitimate state purpose. For these reasons it violates neither the Fourteenth Amendment to the *United States Constitution* nor *W.Va. Const.*, art. III, § 17. *See* syl. pt. 3, *Shackleford v. Catlett*, 161 W.Va. 568, 244 S.E.2d 327 (1978); Note, *Legislative Purpose, Rationality and Equal Protection*, 82 Yale L.J. 123 (1972).

The West Virginia Public Employees' Retirement System is the standard for all West Virginia public employees, and judges are eligible both to join it initially and to transfer into it. The judicial retirement system is an optional retirement system for judges that they may elect to join. Were judges forced to join the judicial retirement system there might, indeed, be equal protection problems, but as the system is entirely voluntary, it must be accepted either in its entirety or not at all.

Although the original intention of the judicial retirement scheme may have been poorly implemented, it was rationally calculated to attract qualified lawyers to serve as judges and to encourage them to serve for two full elected terms. It has always been a problem in state government that successful practicing lawyers cannot be paid a sufficient salary to attract them to government service without creating the appearance of inequities in the State's salary schedule. For this reason most government lawyers are young and inexperienced. I doubt that many of our good judges would be willing to serve at the current salary level without the added inducement of a peculiarly favorable retirement plan.

The retirement plan, then, was designed as a way of attracting competent people to the bench without creating irresistible pressure to overpay a host of other state employees. The brilliance of the scheme was that the retirement plan's complexity and deferred nature obscured it and prevented the compensation of judges from becoming a *cause célèbre*. The same problem as well as the same solution occurs in other contexts whenever the state must hire professionals who are regularly compensated outside of government at a very high level: the well-qualified doctors at the West Virginia University Medical Center, for example, regularly earn half again as much as the Governor of West Virginia! Our state

hospitals, on the other hand, where the salaries are more in line with other government compensation, are staffed largely by doctors who barely speak English and who graduated from foreign medical schools where clinical training is either sparse or non-existent.

The provision in the judicial retirement system that allows credit for years spent as a prosecuting attorney but not years spent in other government service is perfectly rational and is not discriminatory. Prosecutors are the lawyers in our system who perform functions closer to the functions that judges perform than any other lawyers. Although the criminal defense bar may complain that trial judges are already too prosecution-oriented, that is an objection that goes to policy and not rationality. Prosecutors have experience representing all of the county governmental entities and prosecutors have extensive experience trying criminal cases, working with juveniles, and providing protective services.

## V

Finally, I vociferously dissent to syllabus point 7 of the majority opinion that holds that the public employees' retirement system is a "substituted" retirement system under *W. Va. Const.*, art. VIII, § 8. *W. Va. Const.*, art. VIII, § 8 gives extensive power to the West Virginia Supreme Court of Appeals to recall retired judges for active service on both the circuit court and supreme court benches. It is obvious that

the intention of the drafters and ratifiers of that constitutional section was to allow this Court to take judges who had served a full sixteen years in our courts of general jurisdiction and recall them to active duty: it is inconceivable to me that judges who have been rejected by the people after eight or fewer years of service on the bench, as the petitioner in this case indeed was, can then be recalled for active duty at the whim of this Court. I am further appalled by the thought that a judge can serve the five years necessary to vest his pension under the West Virginia Public Employees' Retirement System, resign his commission as a judge, and then be regularly recalled by this Court for active service.

## VI

Unfortunately, as a result of the style of the majority opinion I have great difficulty understanding it in its entirety and separating its holdings from its dicta. I have, therefore, contented myself by registering dissent only to the syllabi. Probably if I understood the majority opinion more I would dissent more.